# EXHIBIT A

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:18 PM 04/08/2010*
*FILED 01:59 PM 04/08/2010*
*SRV 100363633 - 4809319 FILE*

# STATE *of* DELAWARE
## FOREIGN CORPORATION CERTIFICATE

- **The Undersigned,** a corporation duly organized and existing under the laws of the State of West Virginia _____, in accordance with the provisions of Section 371 of Title 8 of the Delaware Code, does hereby certify:

- **First:** That Mylan Pharmaceuticals Inc. _____ is a corporation duly organized and existing under the laws of the State of West Virginia _____ and is filing herewith a certificate evidencing its corporate existence.

- **Second:** That the name and address of its Registered Agent in said State of Delaware upon whom service of process may be had is _____ Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 _____.

- **Third:** That the assets of said corporation are $ 9,686,456,915 _____ and the liabilities thereof are $ 3,319,360,180 _____. The assets and liabilities indicated are as of a date within six months prior to the filing date of this Certificate.

- **Fourth:** That the business which it proposes to do in the State of Delaware is as follows: Pharmaceutical manufacturing, distribution and sales. _____

- **Fifth:** That the business which it proposes to do in the state of Delaware is the business it is authorized to do in the jurisdiction of its incorporation.

- **In Witness Whereof,** said corporation has caused this Certificate to be signed on its behalf this 7th day of April _____, 20 10 _____.

By: _Kristin Kolesar_
(Authorized Officer)

Name: Kristin A. Kolesar
(Typed or Printed)



# State of West Virginia

## Certificate

*I, Natalie E. Tennant, Secretary of State of the*
*State of West Virginia, hereby certify that*

### MYLAN PHARMACEUTICALS INC.

was incorporated under the laws of West Virginia and a Certificate of Incorporation was issued by the West Virginia Secretary of State's Office on January 1, 1961.

I further certify that the corporation has not been revoked by the State of West Virginia nor has the West Virginia Secretary of State issued a Certificate of Dissolution to the corporation.

Accordingly, I hereby issue this

## CERTIFICATE OF EXISTENCE



*Given under my hand and the*
*Great Seal of the State of*
*West Virginia on this day of*
*April 7, 2010*

_____
*Secretary of State*

# EXHIBIT B

Division of Corporations - Online Services

---

**Department of State: Division of Corporations**

---

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service
Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request
How to Form a New
Business Entity
Certifications, Apostilles
& Authentication of
Documents

Privacy Policy    Frequently Asked Questions    View Search Results

---

### Entity Details

---

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **4809319** | Incorporation Date / Formation Date: | **04/08/2010** (mm/dd/yyyy) |
| Entity Name: | **MYLAN PHARMACEUTICALS INC.** | | |
| Entity Kind: | **CORPORATION** | Entity Type: | **GENERAL** |
| Residency: | **FOREIGN** | State: | **WV** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **CORPORATION SERVICE COMPANY** | | |
| Address: | **2711 CENTERVILLE RD SUITE 400** | | |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **(302)636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like  ○ Status   ○ Status,Tax & History Information   [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

---

# EXHIBIT C





## State of Delaware
### The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search

Citizen Services | Business Services | Visitor Info.

---

## Licensee Information

**Full Name:** Mylan Pharmaceuticals Inc

## License Information

| | | | | | |
|---|---|---|---|---|---|
| **License No:** | A4-0001719 | **Profession:** | Pharmacy | **License Type:** | Pharmacy - Wholesale |
| **License Status:** | Active | **Issue Date:** | 7/23/2010 | **Expiration Date:** | 9/30/2016 |

## Address Information

*This information is from the address supplied by the licensee. For most license types, licensees may choose a residence, business or other mailing address.*

**City:** Morgantown **State:** WV **Zipcode:** 26504 **Country:** United States

## Discipline Information

*If the licensee above has been disciplined, violations cited in the disciplinary order, consent agreement or reprimand appear below. Violations refer to a section of The Delaware Code (law) or Rules and Regulations, as it was numbered when the discipline occurred. (Note that section numbers sometimes change.) For example, violation T24-S-3302(6)a refers to Title 24 of The Delaware Code, Section 3302, subsection 6a. Violation Reg. 1.2.12 refers to section 1.2.12 of the Board's Rules and Regulations. The disciplinary actions resulting from the violations, together with the date(s) of the action, are also shown. Note that multiple violations may result in a single disciplinary action or that a single violation may result in multiple disciplinary actions. To view the law, click The Delaware Code. To view a profession's Rules and Regulations, click www.dpr.delaware.gov, select the profession and then click Rules and Regulations on the left.*

No Discipline Information

## Limits/Restriction Information

*If limits/restrictions have been imposed on the licensee above, the date(s) of the limit/restriction are shown below.*

No Limits/Restriction Information

## Public Documents

*The Division of Professional Regulation is in the process of making public disciplinary orders and consent agreements from 2006 to the present available online. If disciplinary information appears above but no documents are listed below, the Division has not yet added the documents to the webpage. To request the documents, click Request for Public Records form.*

No Public Documents Available Online

# EXHIBIT D





# State of Delaware
## The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search

Citizen Services | Business Services | Visitor Info.

## Licensee Information

**Full Name:** Mylan Pharmaceuticals Inc

## License Information

| | | | | | |
|---|---|---|---|---|---|
| **License No:** | DM-0007571 | **Profession:** | Controlled Substances | **License Type:** | Distributor/Manufacturer CSR |
| **License Status:** | Active | **Issue Date:** | 7/23/2010 | **Expiration Date:** | 6/30/2015 |

## Address Information

This information is from the address supplied by the licensee. For most license types, licensees may choose a residence, business or other mailing address.

**City:** Morgantown **State:** WV **Zipcode:** 26504 **Country:** United States

## Discipline Information

If the licensee above has been disciplined, violations cited in the disciplinary order, consent agreement or reprimand appear below. Violations refer to a section of *The Delaware Code* (law) or Rules and Regulations, as it was numbered when the discipline occurred. (Note that section numbers sometimes change.) For example, violation T24-S-3302(6)a refers to Title 24 of *The Delaware Code*, Section 3302, subsection 6a. Violation Reg. 1.2.12 refers to section 1.2.12 of the Board's Rules and Regulations. The disciplinary actions resulting from the violations, together with the date(s) of the action, are also shown. Note that multiple violations may result in a single disciplinary action or that a single violation may result in multiple disciplinary actions. To view the law, click *The Delaware Code*. To view a profession's Rules and Regulations, click www.dpr.delaware.gov, select the profession and then click Rules and Regulations on the left.

No Discipline Information

## Limits/Restriction Information

If limits/restrictions have been imposed on the licensee above, the date(s) of the limit/restriction are shown below.

No Limits/Restriction Information

## Public Documents

The Division of Professional Regulation is in the process of making public disciplinary orders and consent agreements from 2006 to the present available online. If disciplinary information appears above but no documents are listed below, the Division has not yet added the documents to the webpage. To request the documents, click *Request for Public Records* form.

No Public Documents Available Online

# EXHIBIT E

**EDGAR**Online

# MYLAN INC.

# FORM 10-K
(Annual Report)

## Filed 02/27/14 for the Period Ending 12/31/13

| | |
|---|---|
| Address | 1000 MYLAN BOULEVARD |
| | CANONSBURG, PA 15317 |
| Telephone | 724-514-1800 |
| CIK | 0000069499 |
| Symbol | MYL |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By **EDGAR**Online

http://www.edgar-online.com

© Copyright 2014, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-K

☑     **Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
      **For the Fiscal Year Ended December 31, 2013**

OR

☐     **Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
      **For the transition period from      to      .**

**Commission file number 1-9114**

# MYLAN INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Pennsylvania** | **25-1211621** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317**
*(Address of principal executive offices)*

**(724) 514-1800**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class:** | **Name of Each Exchange on Which Registered:** |
|---|---|
| Common Stock, par value $0.50 per share | The NASDAQ Stock Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

     Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑      No ☐

     Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐      No ☑

     Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑      No ☐

     Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☑      No ☐

     Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

     Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
|     (Do not check if a smaller reporting company) | | | |

     Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐      No ☑

     The aggregate market value of the outstanding common stock, other than shares held by persons who may be deemed affiliates of the registrant, as of June 30, 2013 , the last business day of the registrant's most recently completed second fiscal quarter, was approximately $11,772,902,098 .

     The number of shares outstanding of common stock of the registrant as of February 21, 2014 , was 371,912,507 .

### INCORPORATED BY REFERENCE

| **Document** | **Part of Form 10-K into Which Document is Incorporated** |
|---|---|
| Proxy Statement for the 2014 Annual Meeting of Shareholders, which will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2013. | III |

**MYLAN INC.**
**INDEX TO FORM 10-K**
**For the Year Ended December 31, 2013**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 23 |
| ITEM 1B. | Unresolved Staff Comments | 43 |
| ITEM 2. | Properties | 43 |
| ITEM 3. | Legal Proceedings | 43 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 44 |
| ITEM 6. | Selected Financial Data | 46 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 47 |
| ITEM 7A. | Quantitative and Qualitative Disclosures about Market Risk | 67 |
| ITEM 8. | Financial Statements and Supplementary Data | 69 |
| ITEM 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 120 |
| ITEM 9A. | Controls and Procedures | 121 |
| ITEM 9B. | Other Information | 121 |
| **PART III** | | |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 122 |
| ITEM 11. | Executive Compensation | 122 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 122 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 122 |
| ITEM 14. | Principal Accounting Fees and Services | 122 |
| **PART IV** | | |
| ITEM 15. | Exhibits and Consolidated Financial Statement Schedules | 123 |
| Signatures | | 131 |

2

**PART I**

**ITEM 1.     Business**

Mylan Inc., along with its subsidiaries (collectively, the "Company," "Mylan," "our" or "we"), is a leading global pharmaceutical company, which develops, licenses, manufactures, markets and distributes generic, branded generic and specialty pharmaceuticals. Mylan is committed to setting new standards in health care and our mission is to provide the world's 7 billion people access to high quality medicine. To do so, we innovate to satisfy unmet needs; make reliability and service excellence a habit; do what's right, not what's easy; and impact the future through passionate global leadership.

Mylan offers one of the industry's broadest product portfolios, including more than 1,300 marketed products, to customers in approximately 140 countries and territories. We operate a global, high quality vertically-integrated manufacturing platform, which includes more than 35 manufacturing facilities around the world and one of the world's largest active pharmaceutical ingredient ("API") operations. We also operate a strong research and development ("R&D") network that has consistently delivered a robust product pipeline. Additionally, Mylan has a specialty business that is focused on respiratory and allergy therapies.

**Overview**

Throughout its history, Mylan has been recognized as a leader in the United States ("U.S.") generic pharmaceutical industry. Our leadership position is the result of, among other factors, our ability to efficiently obtain Abbreviated New Drug Application ("ANDA") approvals and our reliable and high quality supply chain.

Since 2007, through organic growth and transformative acquisitions, Mylan has become one of the largest generic and specialty pharmaceuticals companies in the world today in terms of revenue and is now recognized as an industry leader globally.

On December 4, 2013 , we acquired the Agila Specialties business (" Agila "), a developer, manufacturer and marketer of high-quality generic injectable products, from Strides Arcolab Limited (" Strides Arcolab ") for approximately $1.4 billion , which includes contingent consideration estimated at $250 million . Through this acquisition, along with our earlier acquisitions of Mylan Laboratories Limited (formerly known as Matrix Laboratories Limited ), Merck KGaA's generics and specialty pharmaceutical business, Bioniche Pharma Holdings Limited (" Bioniche Pharma ") and Pfizer Inc.'s respiratory delivery platform (the "respiratory delivery platform"), we have created a horizontally and vertically integrated platform with global scale, augmenting our diversified product portfolio and further expanding our range of capabilities, all of which we believe position us well for the future.

Today, in addition to the U.S., Mylan has a robust worldwide commercial presence in the generic pharmaceutical market, including leadership positions in France and Australia and several other key European markets as well as markets around the world. Mylan is also a leader in branded specialty pharmaceuticals focusing on respiratory and allergy products.

Currently, Mylan markets a global portfolio of more than 1,300 different products covering a vast array of therapeutic categories. We offer an extensive range of dosage forms and delivery systems, including oral solids, topicals, liquids and semi-solids while focusing on those products that are difficult to formulate and manufacture, and typically have longer life cycles than traditional generic pharmaceuticals, including transdermal patches, high potency formulations, injectables, controlled-release and respiratory products. In addition, we offer a wide range of antiretroviral therapies ("ARVs"), upon which a large percentage of HIV/AIDS patients in developing countries depend. Mylan also operates one of the largest API manufacturers, supplying low cost, high quality API for our own products and pipeline as well as for a number of third parties.

We believe that the breadth and depth of our business and platform provide certain competitive advantages in major markets in which we operate, including less dependency on any single market or product. As a result, we are better able to successfully compete on a global basis than many of our competitors.

**Our Operations**

Mylan was incorporated in Pennsylvania in 1970 and operates in two segments, "Generics" and "Specialty." Our revenues are derived primarily from the sale of generic and branded generic pharmaceuticals, specialty pharmaceuticals and API. Our generic pharmaceutical business is conducted primarily in the U.S. and Canada (collectively, "North America"); Europe, the Middle East, and Africa (collectively, "EMEA"); and India, Australia, Japan, New Zealand and Brazil (collectively, "Rest of World"). References in this Annual Report to Asia Pacific represent our generic pharmaceutical business in India,

Australia, Japan and New Zealand prior to the acquisition of Agila and the inclusion of Brazil within the Rest of World. Our API business is conducted through Mylan Laboratories Limited ("Mylan India"), which is included within the Rest of World in our Generics segment. Our specialty pharmaceutical business is conducted by Mylan Specialty L.P. ("Mylan Specialty"). Refer to Note 13 for Consolidated Financial Statements included in Item 8 in this Form 10-K for additional information related to our segments, including our geographic markets.

The Company's corporate headquarters is located in Canonsburg, Pennsylvania. Our global operational footprint, including the locations of our manufacturing facilities, global R&D centers of excellence and technology focused development sites, along with the sites' primary activities, are detailed on the map below:



Our global manufacturing platform serves as an important component for the successful execution of our continued transformation. We own six production, distribution and warehousing facilities in the U.S. and Puerto Rico, including significant production and distribution sites in Morgantown, West Virginia; St. Albans, Vermont; Caguas, Puerto Rico; and, Greensboro, North Carolina. Outside the U.S. and Puerto Rico, we own production, distribution and warehousing facilities in nine countries, including key facilities in India, Australia, Japan, Ireland, Brazil, Hungary and Poland. The Company also leases warehousing, distribution and administrative facilities in numerous locations, both within and outside of the U.S., including properties in New York, France, India and the United Kingdom ("U.K."). All of the production, distribution and warehousing facilities are included within the Generics segment; however, certain locations also support our Specialty segment.

Our global R&D centers of excellence are located in Morgantown, West Virginia and Hyderabad, India. We also have specific R&D technology centers of excellence in Ireland, India, the U.K. and Japan.

We believe that all facilities are in good operating condition, the machinery and equipment are well-maintained, the facilities are suitable for their intended purposes and they have capacities adequate for the current operations.

*Generics Segment*

*North America*

The U.S. generics market is the largest in the world, with generic prescription sales of $50.0 billion for the twelve months ended November 2013 . Mylan holds the number one ranking in the U.S. generics prescription market in terms of sales and the number two ranking in terms of prescriptions dispensed. Approximately one in every 12 prescriptions dispensed in the U.S. is a Mylan product. Our sales in the U.S. are derived primarily from the sale of oral solid dosage, injectable and transdermal products and unit dose offerings. In the U.S., we have one of the largest product portfolios among all generic pharmaceutical companies, consisting of approximately 320 products, of which approximately 260 are in capsule or tablet form in an aggregate of approximately 790 dosage strengths. Included in these totals are approximately 40 extended-release products in a total of approximately 100 dosage strengths.

We manufacture and sell a diverse portfolio of injectable products across several key therapeutic areas, including antineoplastics, anti-infectives, anesthesia/pain management and cardiovascular. Our product offerings include a diverse portfolio of approximately 60 injectable products (branded and generic) in a total of approximately 130 dosage strengths. With the acquisition of Agila , Mylan brings an even broader portfolio to the injectables market, including doubling our injectables portfolio to 120 products and increasing our production capacity from approximately 350 million units in 2013 to approximately 650 million units by 2016 . In addition, Agila provides us with diversity and increased technological capabilities built upon industry-leading sterile manufacturing, enhanced lyophilization processes, advanced delivery systems and facilities dedicated to beta-lactams and penems. Through our acquisition of Agila , we also acquired a 50% equity interest in Sagent Agila LLC (" Sagent Agila "). Sagent Agila was established in January 2007 to allow for the development, manufacturing and distribution of certain generic injectable products in the U.S. market.

Our unit dose business focuses on providing one of the largest product portfolios along with innovative packaging and barcoding that supports bedside verification for customers throughout the U.S. and Canada. These customers include hospitals, group purchasing organizations ("GPOs"), long term care facilities, wholesalers, surgical services, home infusion service providers, correctional facilities, specialty pharmacies and retail outlets. In addition to the products we package in the U.S., we also market approximately 60 generic products in a total of approximately 85 dosage strengths under supply and distribution agreements with wholesalers.

Also included in our U.S. product portfolio are four transdermal patch products in a total of 18 dosage strengths. Our Fentanyl Transdermal System ("Fentanyl") was the first AB-rated generic alternative to Duragesic® on the market and was also the first generic class II narcotic transdermal product ever approved. Our Fentanyl product currently remains the only AB-rated generic alternative approved in all strengths.

We believe that the breadth and quality of our product offerings help us to successfully meet our customers' needs and to better compete in the generic industry over the long-term. The future growth of our U.S. generics business is partially dependent upon continued acceptance of generic products as low cost alternatives to branded pharmaceuticals, a trend which is largely outside of our control. However, we believe that we can maximize the profitability of our generic product opportunities by continuing our proven track record of bringing to market high quality products that are difficult to formulate or manufacture. Over the last several years we have successfully introduced many generic products that are difficult to formulate or manufacture and continue to be meaningful contributors to our business several years after their initial launch. Additionally, we expect to achieve growth in our U.S. business by launching new products for which we may attain U.S. Food and Drug Administration ("FDA") first-to-file status with Paragraph IV certification. As described further in the "Product Development and Government Regulation" discussion below, Paragraph IV certification makes the product approval holder eligible for a period of generic marketing and distribution exclusivity.

In Canada, we offer a portfolio of approximately 150 products in an aggregate of approximately 340 dosage strengths and currently rank fifth in terms of market share in the generic prescription market. Canada is the world's sixth largest generic prescription market by value and the eighth largest generic prescription market by volume, with sales of $4.1 billion for the twelve months ended November 2013 . As in the U.S., growth in Canada will be dependent upon acceptance of generic products as low cost alternatives to branded pharmaceuticals. Further, we plan to leverage the strength and reliability of the Mylan brand to foster growth throughout the region. With the recent acquisition of Agila , we are further diversifying our pharmaceutical portfolio by adding generic injectable products in the Canadian market.

*EMEA*

Our generic pharmaceutical sales in EMEA are generated primarily by our wholly owned subsidiaries in Europe, through which we have operations in 21 countries. The types of markets within Europe vary from country to country; however, when combined, the European market is the second largest generic pharmaceutical market in the world in terms of value. Within Europe, by value, the generic prescription market in Germany is the largest , followed by France, the U.K., Spain and Poland, respectively. Of the top ten generic prescription markets in Europe, we hold leadership positions in several markets, described below, including the number one market share position in France, the number two market share position in Italy and the number three market share position in Portugal.

The European generic prescription market varies significantly by country in terms of the extent of generic penetration, the key decision maker in terms of drug choice and other important aspects. Some countries, including Germany, the U.K., the Netherlands and Poland, are characterized by relatively high generic penetration, ranging between 60% and 71% of total prescription market sales in the twelve months ended November 2013 , based on volume. Conversely, other major European markets, including France, Italy and Spain, are characterized by much lower generic penetration, ranging between 18% and

39% of total prescription sales in the twelve months ended November 2013 , based on volume. However, recent actions taken by governments, particularly in these latter under-penetrated countries, to reduce health care costs could encourage further use of generic pharmaceutical products. In each of these under-penetrated markets, in addition to growth from new product launches, we expect our future growth to be driven by increased generic utilization and penetration.

The manner in which products are marketed also varies by country. In addition to selling pharmaceuticals under their International Nonproprietary Name ("INN") (i.e., active ingredient), in certain European countries, there is a market for both branded generic products and "company-branded" generic products. Branded generic pharmaceutical products are given a unique brand name, as these markets tend to be more responsive to the promotion efforts generally used to promote brand products. Company-branded products generally consist of the name of the active ingredient with a prefix or suffix of the company's name, either in whole or in part.

*France*

In France, we market a portfolio, including both oral solid and injectable dosage forms, of approximately 280 products in an aggregate of approximately 940 dosage strengths. We have the highest market share in the company-branded generic prescription market, with a share of approximately 26% . Our future growth in the French market is expected to come primarily from new product launches and increased generic utilization and penetration through government initiatives.

*Italy*

In Italy, we market a portfolio of approximately 180 products in an aggregate of approximately 350 dosage strengths. We have the second highest market share in the company-branded generic prescription market. We believe that the Italian generic market is under-penetrated, with company-branded generics representing approximately 19% of the Italian pharmaceutical market, based on volume. The Italian government has put forth only limited measures aimed at encouraging generic use, and as a result, generic substitution is still in its early stages. Our growth in the Italian generics market will be fueled by increasing generic utilization and penetration and new product launches.

*U.K.*

In the U.K., we market a portfolio of approximately 180 products in an aggregate of approximately 360 dosage strengths. Mylan is ranked fifth in the U.K. generic prescription market, in terms of value, with an estimated market share of approximately 8% . Mylan is well positioned in the U.K. as a preferred supplier to wholesalers and is also focused on areas such as multiple retail pharmacies and hospitals. The U.K. generic prescription market is highly competitive, and any growth in the market will stem from new product launches although we expect that the value will continue to be affected by price erosion.

*Spain*

In Spain, we market a portfolio of approximately 130  products in an aggregate of approximately 250 dosage strengths. We have the seventh highest market share in the company-branded generic prescription market. The company-branded generic market comprised approximately 32% of the total Spanish pharmaceutical market by volume for the twelve months ended November 2013 . We view further generic utilization and penetration of the Spanish market to be a key driver of our growth in that country.

*The Netherlands*

In the Netherlands, we market a portfolio of approximately 230 products in an aggregate of approximately 460 dosage strengths. We have the fourth largest market share in the company-branded generic prescription market. The Netherlands is characterized by relatively high generic penetration representing approximately 60% of total prescription market sales in the twelve months ended November 30, 2013, based on volume.

*Germany*

In Germany, we market a portfolio of approximately 160 products in an aggregate of approximately 350 dosage strengths. A tender system has been implemented in Germany and, as a result, health insurers play a major role in this market. Under a tender system, health insurers invite manufacturers to submit bids that establish prices for generic pharmaceuticals. Pricing pressures result from an effort to win the tender. As a result of these tenders, our business in Germany has declined, and future growth in the German marketplace will depend upon our ability to compete based primarily on price.

*Poland*

As part of the acquisition of Agila , we acquired an injectable manufacturing facility in Poland. The facility specializes in the production of injectable doses including ampoules, liquid vials and pre-filled syringes. We manufacture approximately 20 products in an aggregate of approximately 50 dosage strengths, primarily for distribution within Europe. In addition, we also operate a commercial business in Poland focused on the generic prescription market. Our future growth is expected to come from increasing the production capacity of our injectable facility and through new product launches.

*Other EMEA Locations*

We have a notable presence in other European company-branded generic prescription markets, including Portugal, where we hold the third highest market share. We also operate in several other European markets, including Ireland, the Nordic countries (principally Sweden and Finland), Belgium, the Czech Republic and Hungary. Additionally, we have an export business which is focused on Africa and the Middle East.

*Rest of World*

We market generic pharmaceuticals in the Rest of World through subsidiaries in India, Australia, Japan, New Zealand, Brazil and Taiwan. We also participate in a collaboration with Pfizer Japan Inc. ("Pfizer Japan") to develop, manufacture, distribute and market generic drugs in Japan. Additionally, through Mylan India, we market API to third parties and also supply other Mylan subsidiaries. We have the highest market share in both the Australian and New Zealand generic pharmaceuticals markets.

*India*

Mylan India manufactures and supplies low cost, high quality API for our own products and pipeline, as well as for numerous third parties. Mylan India is one of the world's largest API manufacturers as measured by the number of drug master files ("DMFs") filed with regulatory agencies and is among the leaders in supplying API for the manufacturing of ARV drugs. Mylan India also produces a line of finished dosage form ("FDF") products for the ARV market, which are sold mostly outside of India. Additionally, Mylan India manufactures non-ARV FDF products that are marketed and sold to third parties by other Mylan operations around the world. Expansion of Mylan India's portfolio and an increase in product sales within India and other geographies both are key drivers of our future growth.

In addition to the sale of FDF products, we currently have approximately 275 APIs in the market or under development and we focus our marketing efforts on regulated markets such as the U.S. and the European Union (the "EU"). We produce API for use in the manufacture of our own pharmaceutical products, as well as for use by third parties, in a wide range of categories, including anti-bacterials, central nervous system agents, anti-histamine/anti-asthmatics, cardiovasculars, anti-virals, anti-diabetics, anti-fungals, proton pump inhibitors and pain management drugs.

Mylan India has nine API and intermediate manufacturing facilities, five FDF facilities and two injectable facilities. All of these facilities are located in India, with the exception of one , which is located in China. Eight of the API facilities and two FDF facilities located in India have been successfully inspected by the FDA, which makes Mylan India one of the largest companies in India in terms of API manufacturing facilities that have passed FDA inspection. From an API standpoint, growth is dependent upon us continuing to leverage our R&D capabilities to produce high quality, low cost API, while capitalizing on the greater API volumes afforded through our vertically integrated platform.

In August 2012, Mylan India commenced commercial operations in India starting with the launch of a comprehensive portfolio of FDF ARV products for the treatment of HIV/AIDS. In June 2013, Mylan India added a portfolio of women's health care products focused on hormone and infertility treatments along with nutritional supplements. In October 2013, Mylan's partner, Biocon Limited (" Biocon "), received approval for Trastuzumab from the Drug Controller General of India. Trastuzumab is one of the five biosimilar products Mylan is developing in partnership with Biocon for the global marketplace. The product is a biosimilar to Roche's Herceptin®, indicated for the treatment of HER2 overexpressing breast cancer. We launched this product in India in early 2014 and are marketing the product under the trade name Hertraz. Mylan India expects to continue to enhance its commercial portfolio in India by adding products from additional therapeutic categories and increase its sales force across India.

Agila has a broad product portfolio of more than 375 filings approved globally and marketed through a network covering 75 countries, including, as of November 2013, approximately 320 filings pending approval globally. Agila 's product portfolio includes approximately 115 products, of which approximately 90 are new to Mylan's overall product portfolio. As of

7

December 2013, Agila had over 80 ANDAs approved by the FDA and 136 ANDAs pending FDA approval. Agila manufactures products at nine facilities in India, Brazil and Poland, eight of which have been successfully inspected by the FDA. Six of Agila's manufacturing facilities are located in India. Agila 's manufacturing capabilities include vials, pre-filled syringes, ampoules and lyophilization with a focus on antineoplastics, penems, penicillins, ophthalmics and peptides.

*Australia*

The generic pharmaceutical market in Australia had sales of approximately $2.3 billion during the twelve months ended June 2013 . Our Australian operation has the highest market share in the off-patent market with an estimated 27% market share by volume and we offer a portfolio of approximately 180 products in an aggregate of approximately 375 dosage strengths. The Australian generics market is still underdeveloped and, as a result, the government is increasingly focused on encouraging the use of generics in an effort to reduce costs. Maintaining our position of market leadership as the market undergoes further generic utilization and penetration and continued pricing pressure will be instrumental to our future success in Australia.

*Japan*

Beginning in 2013, we established an exclusive long-term strategic collaboration with Pfizer Japan to develop, manufacture, distribute and market generic drugs in Japan. Under the agreement, both parties operate separate legal entities in Japan and collaborate on current and future generic products, sharing the costs and profits resulting from such collaboration. Mylan's responsibilities in Japan primarily consist of managing operations, including R&D and manufacturing. Pfizer Japan's responsibilities primarily consist of the commercialization of the combined generics portfolio and managing a combined marketing and sales effort.

In Japan, together with our partner Pfizer Japan, we offer a broad portfolio of more than 310 products in an aggregate of approximately 475 dosage strengths. We also have a manufacturing and packaging facility located in Japan, which is key to supplying our collaboration in Japan. Japan is the second largest pharmaceutical market in the world by volume, behind the U.S. and the seventh largest generic prescription market worldwide by value, with sales of approximately $3.7 billion during the twelve months ended November 2013 . Currently, the market is largely composed of hospitals and clinics, but pharmacies are expected to play a greater role as generic substitution, aided by recent pro-generics government action, becomes more prevalent. The Japanese government has stated that it intends to grow utilization in the off-patent market to 60% by the end of March 2018 from approximately 47% at the end of December 2013.

*New Zealand*

In New Zealand, we are the largest generics company in the country. New Zealand is a government tender market where pharmaceutical suppliers can gain exclusivity of up to three years . Mylan New Zealand offers a portfolio of approximately 90 products in an aggregate of approximately 170 dosage strengths.

*Brazil*

We began commercial operations in Brazil in the fourth quarter of 2013 through the acquisition of Agila . In this market, we operate both a manufacturing platform and a commercial business focused on providing high quality generic injectable products to the Brazilian hospital segment. Our sales into this market segment are made through distributors as well as through tenders. Our goal is to build upon this local platform in order to further access the growing $30 billion Brazilian pharmaceutical market. We are actively working to utilize our global R&D and manufacturing capabilities, along with our robust and differentiated product portfolio to meaningfully expand our hospital offerings in key therapeutic areas. In addition, we are beginning to explore opportunities to further leverage the Mylan platform and expand to other dosage forms and product offerings in Brazil.

*Specialty Segment*

Our specialty pharmaceutical business is conducted through Mylan Specialty, which competes primarily in the respiratory and severe allergy markets. Mylan Specialty's portfolio consists primarily of branded specialty injectable and nebulized products. A significant portion of Mylan Specialty's revenues are derived through the sale of the EpiPen® Auto-Injector .

The EpiPen® Auto-Injector , which is used in the treatment of severe allergic reactions, is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s. Mylan Specialty has worldwide rights to the epinephrine

auto-injector, which is supplied to Mylan Specialty by a wholly owned subsidiary of Pfizer Inc. Anaphylaxis is a severe allergic reaction that is rapid in onset and may cause death, either through swelling that shuts off airways or through significant drop in blood pressure. In December 2010, the National Institute of Allergy and Infectious Diseases, a division of the National Institutes of Health, introduced the "Guidelines for the Diagnosis and Management of Food Allergy in the United States." These guidelines state that epinephrine is the first line treatment for anaphylaxis. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector. The strength of the EpiPen® brand name, quality and ease of use of the product and the promotional strength of the Mylan Specialty U.S. sales force have enabled us to maintain our leadership position within this therapeutic category.

Performorist® Inhalation Solution , Mylan Specialty's formoterol fumarate inhalation solution, was launched in October 2007. Perforomist® Inhalation Solution is a long-acting beta $_2$ -adrenergic agonist indicated for long-term, twice-daily administration in the maintenance treatment of bronchoconstriction in chronic obstructive pulmonary disorder ("COPD") patients, including those with chronic bronchitis and emphysema. Mylan Specialty has been issued several U.S. and international patents protecting Perforomist® Inhalation Solution .

In addition to EpiPen® Auto-Injector and Perforomist® Inhalation Solution , Mylan Specialty also markets ULTIVA® , which is an analgesic agent used during the induction and maintenance of general anesthesia for inpatient and outpatient procedures and is generally administered by an infusion device.

We believe that we can continue to drive the long-term growth of our Specialty segment by successfully managing our existing product portfolio and bringing to market other product opportunities.

**Product Development and Government Regulation**

*Generics Segment*

*North America*

Prescription pharmaceutical products in the U.S. are generally marketed as either brand or generic drugs. Brand products are usually marketed under brand names through marketing programs that are designed to generate physician and consumer loyalty. Brand products generally are patent protected, which provides a period of market exclusivity during which time they are sold with little or no competition for the compound, although there typically are other participants in the therapeutic area. Additionally, brand products may benefit from other periods of non-patent market exclusivity. Exclusivity normally provides brand products with the ability to maintain their profitability for relatively long periods of time and brand products typically continue to play a significant role in the market due to physician and consumer loyalties after the end of patent protection or other market exclusivities.

Generic pharmaceutical products are the chemical and therapeutic equivalents of the brand or a reference listed drug ("RLD"). A reference listed brand drug is an approved drug product listed in the FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, popularly known as the "Orange Book." The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") provides that generic drugs may enter the market after the approval of an ANDA, which requires that bioequivalence to a reference brand drug be demonstrated and the expiration, invalidation or non-infringement of any patents on the corresponding reference brand drug, or the end of any other relevant market exclusivity periods related to the reference brand drug. Generic drugs are bioequivalent to their reference brand name counterparts. Accordingly, generic products provide a safe, effective and cost-efficient alternative to users of these reference brand products. Branded generic pharmaceutical products are generic products that are more responsive to the promotion efforts generally used to promote brand products. Growth in the generic pharmaceutical industry has been and will continue to be driven by the increased market acceptance of generic drugs, as well as the number of brand drugs for which patent terms and/or other market exclusivities have expired.

We obtain new generic products primarily through internal product development. Additionally, we license or co-develop products through arrangements with other companies. All applications for FDA approval must contain information relating to product formulation, raw material suppliers, stability, manufacturing processes, packaging, labeling and quality control. Information to support the bioequivalence of generic drug products or the safety and effectiveness of new drug products for their intended use is also required to be submitted. There are generally two types of applications used for obtaining FDA approval of new products:

*New Drug Application ("NDA")* — An NDA is filed when approval is sought to market a newly developed branded product and, in certain instances, for a new dosage form, a new delivery system or a new indication for a previously approved drug.

*ANDA* — An ANDA is filed when approval is sought to market a generic equivalent of a drug product previously approved under an NDA and listed in the FDA's Orange Book or for a new dosage strength for a drug previously approved under an ANDA.

The ANDA development process is generally less time-consuming and complex than the NDA development process. It typically does not require new preclinical and clinical studies, because it relies on the studies establishing safety and efficacy conducted for the RLD previously approved through the NDA process. The ANDA process, however, does typically require one or more bioequivalence studies to show that the ANDA drug is bioequivalent to the previously approved reference listed brand drug. Bioequivalence studies compare the bioavailability of the proposed drug product with that of the RLD product containing the same active ingredient. Bioavailability is a measure of the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of action. Thus, a demonstration of bioequivalence confirms the absence of a significant difference between the proposed product and the reference listed brand drug in terms of the rate and extent to which the active ingredient or active moiety becomes available at the site of drug action when administered at the same molar dose under similar conditions.

Generic products are generally introduced to the marketplace at the expiration of patent protection for the brand product or at the end of a period of non-patent market exclusivity. However, if an ANDA applicant files an ANDA containing a certification of invalidity, non-infringement or unenforceability related to a patent listed in the Orange Book with respect to a reference drug product, the applicant may be able to market the generic equivalent prior to the expiration of patent protection for the brand product. Such patent certification is commonly referred to as a Paragraph IV certification. If the holder of the NDA sues, claiming infringement or invalidation, within 45 days of notification by the applicant, the FDA may not approve the ANDA application until the earlier of the rendering of a court decision favorable to the ANDA applicant or the expiration of 30 months. An ANDA applicant that is first to file a Paragraph IV certification is eligible for a period of generic marketing exclusivity. This exclusivity, which under certain circumstances may be required to be shared with other applicable ANDA sponsors with Paragraph IV certifications, lasts for 180 days, during which the FDA cannot grant final approval to other ANDA sponsors holding applications for a generic equivalent to the same reference drug.

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent market exclusivity, during which the FDA cannot approve an application for a generic version product. If the reference drug is a new chemical entity, the FDA may not accept an ANDA for a generic product for up to five years following approval of the NDA for the new chemical entity. If it is not a new chemical entity, but the holder of the NDA conducted clinical trials essential to approval of the NDA or a supplement thereto, the FDA may not approve an ANDA for reference NDA product before the expiration of three years. Certain other periods of exclusivity may be available if the RLD is indicated for treatment of a rare disease or the sponsor conducts pediatric studies in accordance with FDA requirements.

Supplemental ANDAs are required for approval of various types of changes to an approved application and these supplements may be under review for six months or more. In addition, certain types of changes may only be approved once new bioequivalence studies are conducted or other requirements are satisfied.

A number of branded pharmaceutical patent expirations are expected over the next several years. These patent expirations should provide additional generic product opportunities. We intend to concentrate our generic product development activities on branded products with significant sales in specialized or growing markets or in areas that offer significant opportunities and other competitive advantages. In addition, we intend to continue to focus our development efforts on technically difficult-to-formulate products or products that require advanced manufacturing technology.

The Biologic License Application ("BLA") regulatory pathway was created to review and approve new applications for drugs that are typically produced in living cells. In 2010, in the context of the adoption of the Patient Protection and Affordable Care Act — H.R. 3590 and the Healthcare and Education Reconciliation Act of 2010 — H.R. 4872, an abbreviated pathway for the approval of generic versions of BLA-approved products ("biosimilars") in the U.S. was created. This happened after legislation or regulatory guidance for abbreviated pathways for generic biologics were adopted in the past years in the EU, Japan and Canada. The FDA is working to implement these provisions and Mylan is a very active participant in this process.

An additional requirement for FDA approval of NDAs and ANDAs is that our manufacturing procedures and operations conform to FDA requirements and guidelines, generally referred to as current Good Manufacturing Practices

Table of Contents

("cGMP"). The requirements for FDA approval encompass all aspects of the production process, including validation and recordkeeping, the standards around which are continuously changing and evolving.

Facilities, procedures, operations and/or testing of products are subject to periodic inspection by the FDA, the Drug Enforcement Administration ("DEA") and other authorities. In addition, the FDA conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems and processes are in compliance with cGMP and other FDA regulations. Our suppliers are subject to similar regulations and periodic inspections.

In 2012, the U.S. President signed the Food and Drug Administration Safety and Innovation Act ("FDASIA"). This legislation was intended to enhance the safety and security of the U.S. drug supply chain by holding all drug manufacturers suppling products to the U.S. to the same FDA inspection standards. Specifically, prior to the passage of FDASIA, U.S. law required U.S. based manufacturers to be inspected by FDA every two years but remained silent with respect to foreign manufacturers, causing some foreign manufacturers to go as many as nine years without a routine FDA cGMP inspection, according to the Government Accountability Office.

FDASIA also includes the Generic Drug User Fee Agreement ("GDUFA"), a novel user fee program to provide FDA with approximately $1.5 billion in total user fees through 2018 focused on three key aims:

*Safety* – Ensure that industry participants, foreign or domestic, are held to consistent quality standards and are inspected with foreign and domestic parity using a risk-based approach.

*Access* – Expedite the availability of generic drugs by bringing greater predictability to the review times for abbreviated new drug applications, amendments and supplements and improving timeliness in the review process.

*Transparency* – Enhance FDA's visibility into the complex global supply environment by requiring the identification of facilities involved in the manufacture of drugs and associated APIs, and improve FDA's communications and feedback with industry.

Under GDUFA, 70% of the total fees will be derived from facility fees paid by FDF manufacturers and API facilities listed or referenced in a pending or approved generic drug applications. The remaining 30% of the total fees will be derived from application fees, including generic drug application fees, prior approval supplement fees and drug master file fees.

In Canada, the registration process for approval of all generic pharmaceuticals has two tracks that proceed in parallel. The first track of the process involves an examination of the proposed generic product by Health Canada to ensure that the quality, safety and efficacy of the proposed generic product meets Canadian standards and bioequivalence requirements and the second track concerns patent rights of the brand drug owner. Companies may submit an application called an abbreviated new drug submission ("ANDS") to Health Canada for sale of the drug in Canada by comparing the drug to another drug marketed in Canada under a Notice of Compliance ("NOC") issued to a first person. When Health Canada is satisfied that the generic pharmaceutical product described in the ANDS satisfies the statutory requirements, it issues an NOC for that product for the uses specified in the ANDS, subject to any court order that may be made in the second track of the approval process.

The second track of the approval process is governed by the Patented Medicines NOC Regulations ("Regulations"). The owner or exclusive licensee of patents relating to the brand drug for which it has an NOC may have established a list of patents administered by Health Canada enumerating all the patents claiming the medicinal ingredient, formulation, dosage form or the use of the medicinal ingredient. It is possible that even though the patent for the API may have expired, the originator may have other patents on the list which relate to new forms of the API, a formulation or additional uses. Most brand name drugs have an associated patent list containing one or more unexpired patents claiming the medicinal ingredient itself or a use of the medicinal ingredient (a claim for the use of the medicinal ingredient for the diagnosis, treatment, mitigation or prevention of a disease, disorder or abnormal physical state or its symptoms). In its ANDS, a generic applicant must make at least one of the statutory allegations with respect to each patent on the patent list, for example, alleging that the patent is invalid or would not be infringed and explaining the basis for that allegation. In conjunction with filing its ANDS, the generic applicant is required to serve the originator a Notice of Allegation ("NOA"), which gives a detailed statement of the factual and legal basis for its allegations in the ANDS. The originator may commence a court application within 45 days after it has been served with the NOA, if it takes the position that the allegations are not justified. When the application is filed in court and served on Health Canada, Health Canada may not issue an NOC until the earlier of the determination of the application by the court after a hearing or the expiration of 24 months from the commencement of the application. The period may be shortened or lengthened by the court in certain circumstances. An NOC can be obtained for a generic product only if the generic respondent is successful in dismissing the application under the Regulations in court. The legal costs incurred in connection with the application could be substantial.

Section C.08.004.1 of the Canadian Food and Drug Regulations is the so-called data protection provision, and the current version of this section applies in respect of all drugs for which an NOC was issued on or after June 17, 2006. A subsequent applicant for approval to market a drug for which an NOC has already been issued does not need to perform duplicate clinical trials similar to those conducted by the first NOC holder, but is permitted to demonstrate safety and efficacy by submitting data demonstrating that its formulation is bioequivalent to the formulation that was issued for the first NOC. The first party to obtain an NOC for a drug will have an eight-year period of exclusivity starting from the date it received its NOC based on those clinical data. A subsequent applicant for approval who seeks to establish safety and efficacy by comparing its product to the product that received the first NOC will not be able to file its own application until six years following the issuance of the first NOC have expired. The Minister of Health will not be permitted to issue an NOC to that applicant until eight years following the issuance of the first NOC have expired — this additional two-year period will correspond in most cases to the 24-month automatic stay under the Regulations. If the first person provides the Minister with the description and results of clinical trials relating to the use of the drug in pediatric populations, it will be entitled to an extra six months of data protection. A drug is only entitled to data protection so long as it is being marketed in Canada.

Facilities, procedures, operations and/or testing of products are subject to periodic inspection by Health Canada and the Health Products and Food Branch Inspectorate. In addition, Health Canada conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems are in compliance with the good manufacturing practices in Canada, Drug Establishment Licensing ("EL") requirements and other provisions of the Regulations. Competitors are subject to similar regulations and inspections.

The provinces and territories in Canada operate drug benefit programs through which eligible recipients receive drugs through public funding; these drugs are listed on provincial or territorial Drug Benefit Formularies (each, a "Formulary"). Eligible recipients include seniors, persons on social assistance, low-income earners and those with certain specified conditions or diseases. Formulary listings are also used by private payors to reimburse generic products. To be listed in a Formulary, drug products must have been issued an NOC and must comply with each jurisdiction's individual review process.

The primary regulatory approval for pharmaceutical manufacturers, distributors and importers selling pharmaceuticals to be marketed in Canada is the issuance of an EL. An EL is issued once Health Canada has approved the facility in which the pharmaceuticals are manufactured, distributed or imported. A key requirement for approval of a facility is compliance with the good manufacturing practices in Canada. For pharmaceuticals that are imported, the license for the importing facility must list all foreign sites at which imported pharmaceuticals are manufactured. To be listed, a foreign site must demonstrate compliance with the good manufacturing practices in Canada.

*EMEA*

The EU presents complex challenges from a regulatory perspective. There is over-arching legislation which is then implemented at a local level by the 28 individual member states, Iceland, Liechtenstein and Norway. Between 1995 and 1998, the legislation was revised in an attempt to simplify and harmonize product registration. This revised legislation introduced the mutual recognition ("MR") procedure, whereby after submission and approval by the authorities of the so-called reference member state ("RMS"), further applications can be submitted into the other chosen member states (known as concerned member states ("CMS")). Theoretically, the authorization of the RMS should be mutually recognized by the CMS. More typically, however, a degree of re-evaluation is carried out by the CMS. In November 2005, this legislation was further revised. In addition to the MR procedure, the decentralized procedure ("DCP") was introduced. The DCP is also led by the RMS, but applications are simultaneously submitted to all selected countries, provided that no national marketing authorization has been granted yet for the medicinal product in question. From 2005, the centralized procedure operated by the European Medicines Agency ("EMA") became available for generic versions of innovator products approved through the centralized authorization procedure. The centralized procedure results in a single marketing authorization, which, once granted, can be used by the marketing-authorization holder to file for individual country reimbursement and make the medicine available in all the EU countries listed on the application.

In the EU, as well as many other locations around the world, the manufacture and sale of pharmaceutical products is regulated in a manner substantially similar to that of the U.S. requirements, which generally prohibit the handling, manufacture, marketing and importation of any pharmaceutical product unless it is properly registered in accordance with applicable law. The registration file relating to any particular product must contain medical data related to product efficacy and safety, including results of clinical testing and references to medical publications, as well as detailed information regarding production methods and quality control. Health ministries are authorized to cancel the registration of a product if it is found to be harmful or ineffective or if it is manufactured or marketed other than in accordance with registration conditions.

Table of Contents

Pursuant to the MR procedure, a marketing authorization is first sought in one member state from the national regulatory agency (the RMS). The RMS makes its assessment report on the quality, efficacy and safety of the medicinal product available to the other CMSs where marketing authorizations are also sought under the MR procedure.

The DCP is based on the same fundamental idea as the MR procedure. In contrast to the MR procedure, however, the DCP requires that no national marketing authorization has yet been granted for the medicinal product. The pharmaceutical company applies for marketing authorization simultaneously in all the member states of the EU in which it wants to market the product. After consultation with the pharmaceutical company, one of the member states concerned in the DCP will become the RMS. The competent agency of the RMS undertakes the scientific evaluation of the medicinal product on behalf of the other CMSs and coordinates the procedure. If all the member states involved (RMS and CMS) agree to grant marketing authorizations, this decision forms the basis for the granting of the national marketing authorizations in the respective member states.

Neither the MR nor DCPs result in automatic approval in all member states. If any member state has objections, particularly in relation to potential serious risk to public health, which cannot be resolved within the procedure scope and timelines, they will be referred to the coordination group for MR and DCPs and reviewed in a 60 -day procedure. If this 60 -day procedure does not result in a consensus by all member states, the product can be marketed in the countries whose health authorities agree that the product can be licensed. The issue raised will then enter a second referral procedure.

As with the MR procedure, the advantage of the DCP is that the pharmaceutical company receives identical marketing authorizations for its medicinal product in all the member states of the EU in which it wants to market the product. This leads to considerable streamlining of all regulatory activities in regard to the product. Variations, line extensions, renewals, etc. are also handled in a coordinated manner with the RMS leading the activity.

Once a DCP has been completed, the pharmaceutical company can subsequently apply for marketing authorizations for the medicinal product in additional EU member states by means of the MR procedure.

All products, whether centrally authorized or authorized by the MR or DCP, may only be sold in other member states if the product information is in the official language of the state in which the product will be sold, which effectively requires specific packaging and labeling of the product.

Under the national procedure, a company applies for a marketing authorization in one member state. The national procedure can now only be used if the pharmaceutical company does not seek authorization in more than one member state. If it does seek wider marketing authorizations, it must use the MR or DCP.

Before a generic pharmaceutical product can be marketed in the EU, a marketing authorization must be obtained. If a generic pharmaceutical product is shown to be essentially the same as, or bioequivalent to, one that is already on the market and which has been authorized in the EU for a specified number of years, as explained in the section on data exclusivity below, no further preclinical or clinical trials are required for that new generic pharmaceutical product to be authorized. The generic applicant can file an abridged application for marketing authorization, but in order to take advantage of the abridged procedure, the generic manufacturer must demonstrate specific similarities, including bioequivalence, to the already authorized product. Access to clinical data of the reference drug is governed by the European laws relating to data exclusivity, which are outlined below. Other products, such as new dosages of established products, must be subjected to further testing, and "bridging data" in respect of these further tests must be submitted along with the abridged application.

An applicant for a generic marketing authorization currently cannot avail itself of the abridged procedure in the EU by relying on the originator pharmaceutical company's data until expiry of the relevant period of exclusivity given to that data. For products first authorized prior to October 30, 2005 , this period is six or ten years (depending on the member state in question and/or the regulatory procedure used by the originator) after the grant of the first marketing authorization sought for the relevant product, due to data exclusivity provisions which have been in place. From October 30, 2005 , the implementation of a new EU directive (2004/27/EC) harmonized the data exclusivity period for originator pharmaceutical products throughout the EU member states, which were legally obliged to have implemented the directive by October 30, 2005 . The new regime for data exclusivity provides for an eight -year data exclusivity period commencing from the grant of first marketing authorization. After the eight -year period has expired, a generic applicant can refer to the data of the originator pharmaceutical company in order to file an abridged application for approval of its generic equivalent product. Yet, conducting the necessary studies and trials for an abridged application, within the data exclusivity period, is not regarded as contrary to patent rights or to supplementary protection certificates for medicinal products. However, the applicant will not be able to launch its product for an additional two years. This ten -year total period may be extended to 11  years if the original marketing authorization holder obtains, within those initial eight years, a further authorization for a new therapeutic use of the product which is shown to be of

13

significant clinical benefit. Further, specific data exclusivity for one year may be obtained for a new indication for a well-established substance, provided that significant preclinical or clinical studies were carried out in relation to the new indication. This new regime for data exclusivity applies to products first authorized after October 30, 2005 .

In addition to obtaining approval for each product, in most EU countries the pharmaceutical product manufacturer's facilities must obtain approval from the national supervisory authority. The EU has a code of good manufacturing practice, with which the marketing authorization holder must comply. Regulatory authorities in the EU may conduct inspections of the manufacturing facilities to review procedures, operating systems and personnel qualifications.

In order to control expenditures on pharmaceuticals, most member states in the EU regulate the pricing and reimbursement of products and in some cases limit the range of different forms of drugs available for prescription by national health services. These controls can result in considerable price differences between member states. In addition, in past years, as part of overall programs to reduce health care costs, certain European governments have prohibited price increases and have introduced various systems designed to lower prices. Some European governments have also set minimum targets for generics prescribing.

Certain markets in which Mylan does business have recently undergone, some for the first time, or will soon undergo, government-imposed price reductions or similar pricing pressures on pharmaceutical products. In addition, a number of markets in which we operate have implemented or may implement tender, or tender-like, systems for generic pharmaceuticals in an effort to lower prices. Such measures are likely to have a negative impact on sales and gross profit in these markets. However, some pro-generic government initiatives in certain markets could help to offset some of this unfavorable effect by potentially increasing generic utilization.

*Rest of World*

*Australia*

The pharmaceutical industry is one of the most highly regulated industries in Australia. The Australian government is heavily involved in the operation of the industry, through the registration of medicines and licensing of manufacturing facilities, as well as subsidizing patient cost of most prescription medicines sold in Australia. The Australian government authority, the Therapeutic Goods Administration (the "TGA"), regulates the quality, safety and efficacy of therapeutic goods and is responsible for granting authorization to market pharmaceutical products in Australia and for inspecting and approving manufacturing facilities.

The TGA operates according to the Commonwealth of Australia's Therapeutic Goods Act 1989 (Cth) (the "Act"). Specifically the Act regulates the registration, listing, quality, safety, efficacy, promotion and sale of therapeutic goods, including pharmaceuticals, supplied in Australia. The TGA carries out a range of assessment and monitoring activities to ensure that therapeutic goods available in Australia are of an acceptable standard with a goal of ensuring that the Australian community has access within a reasonable time to therapeutic advances. Australian manufacturers of all medicines must be licensed under Part 3-3 of the Act and their manufacturing processes must comply with the principles of the good manufacturing practices in Australia. Similar standards and audits apply for both domestic and foreign manufactured products.

Generic medicines are subject to an abbreviated review process by the TGA, if the product can demonstrate essential similarity to the originator brand. Essential similarity means the same active ingredient in the same dose form, delivering the active ingredient to the patient at the same rate and extent, compared to the original brand. If proven, safety and efficacy is assumed to be the same.

All therapeutic goods manufactured for supply in Australia must be listed or registered in the Australian Register of Therapeutic Goods (the "ARTG"), before they can be promoted or supplied for use and/or sale in Australia. The ARTG is a database kept for the purpose of compiling information in relation to therapeutic goods for use in humans and lists therapeutic goods which are approved for supply in Australia.

Medicines assessed as having a higher level of risk must be registered, while those with a lower level of risk can be listed. The majority of listed medicines are self-selected by consumers and used for self-treatment. In assessing the level of risk, factors such as the strength of a product, side effects, potential harm through prolonged use, toxicity and the seriousness of the medical condition for which the product is intended to be used are taken into account.

Labeling, packaging and advertising of pharmaceutical products are also regulated by the Act and other relevant statutes including fair trading laws and pharmaceutical industry codes.

Table of Contents

Australia has a five-year data exclusivity period, whereby any data relating to a pharmaceutical product cannot be referred to or used in the examination by the TGA of another company's dossier, until five years after the original product was approved.

The Pharmaceutical Benefits Scheme (the "PBS"), which has been in place since 1948, subsidizes the cost to consumers of medicines listed on the PBS, if the medicines have demonstrated acceptable clinical need, cost and effectiveness. The goal of the PBS is to make medicines available at the lowest cost compatible with reliable supply and to base access on medical need rather than ability to pay.

The government exerts a significant degree of control over the pharmaceuticals market through the PBS. More than 80% of all prescription medicine sold in Australia is reimbursed by the PBS. The PBS is operated under the Commonwealth of Australia's National Health Act 1953. This statute governs matters such as who may sell pharmaceutical products, the prices at which pharmaceutical products may be sold to consumers and the prices government pays manufacturers, wholesalers and pharmacists for subsidized medicines.

If a new medicine is to be considered for listing on the PBS, the price is determined through a full health economic analysis submitted to the government's advisory committee, the Pharmaceutical Benefits Advisory Committee (the "PBAC"), based on incremental benefit to health outcome. If the incremental benefit justifies the price requested, the PBAC then makes a recommendation to the government to consider listing the product on the PBS. Prior to finalizing listing conditions, negotiations commence between the Pharmaceutical Benefits Pricing Authority and pharmaceutical suppliers to determine specific pricing details and any risk sharing arrangements necessary to ensure the continued cost effective utilization of the new medicine. The Australian government's purchasing power is used to obtain lower prices as a means of controlling the cost of the program. The PBS also stipulates the wholesaler margin for drugs listed on the PBS. Wholesalers therefore have little pricing power over the majority of their product range and as a result are unable to increase profitability by increasing prices.

Following entry of the first generic products onto the market, the PBS price reimbursed to pharmacies decreases by 16% for both the originator product and generic products with a brand equivalence indicator permitting substitution at the pharmacy level. Thereafter, both the originator and generic suppliers are required to disclose pricing information relating to the sale of medicines to the Price Disclosure Data Administrator, and 18 months after initial generic entry, there is a further PBS price reduction based on the weighted average disclosed price if the weighted average disclosed price is 10% or more below the existing PBS price. Ongoing price disclosure cycles and calculation of the weighted average disclosed price occur every 6 months, and further reductions are made to the PBS price whenever the weighted average disclosed price is 10% or more below the existing PBS price. Legislation is currently before the Australian Parliament to reduce the time between initial generic entry and the first weighted average disclosed price reduction to 12 months, from the current 18 months. If the legislation is passed by the Australian Parliament, the first price reductions under the new legislation will take place on October 1, 2014 . The price disclosure system has had, and will continue to have for several years beyond 2014, a negative impact on sales and gross profit in this market.

*Japan*

In Japan, we are governed by various laws and regulations, including the Pharmaceutical Affairs Law (Law No. 145, 1960), as amended, and the Products Liability Law (Law No. 85, 1994).

Under the Pharmaceutical Affairs Law, the retailing or supply of a pharmaceutical that a person has manufactured (including manufacturing under license) or imported is defined as "marketing," and in order to market pharmaceuticals, one has to obtain a license, which we refer to herein as a Marketing License, from the Minister of Health, Labour and Welfare (the "MHLW"). The authority to grant the Marketing License is delegated to prefectural governors; therefore, the relevant application must be filed with the relevant prefectural governor. A Marketing License will not be granted if the quality control system for the pharmaceutical for which the Marketing License has been applied or the post-marketing safety management system for the relevant pharmaceutical does not comply with the standards specified by the relevant Ministerial Ordinance made under the Pharmaceutical Affairs Law.

In addition to the Marketing License, a person intending to market a pharmaceutical must, for each product, obtain marketing approval from the MHLW with respect to such marketing, which we refer to herein as Marketing Approval. Marketing Approval is granted subject to examination of the name, ingredients, quantities, structure, administration and dosage, method of use, indications and effects, performance and adverse reactions, and the quality, efficacy and safety of the pharmaceutical. A person intending to obtain Marketing Approval must attach materials, such as data related to the results of clinical trials (including a bioequivalence study, in the case of generic pharmaceuticals) or conditions of usage in foreign

15

Table of Contents

countries. Japan provides for market exclusivity through a re- examination system, which prevents the entry of generic pharmaceuticals until the end of the re-examination period, which can be up to eight years, and ten years in the case of drugs used to treat rare diseases ("orphan drugs").

The authority to grant Marketing Approval in relation to pharmaceuticals for certain specified purposes (e.g., cold medicines and decongestants) is delegated to the prefectural governors by the MHLW, and applications in relation to such pharmaceuticals must be filed with the governor of the relevant prefecture where the relevant company's head office is located. Applications for pharmaceuticals for which the authority to grant the Marketing Approval remains with the MHLW must be filed with the Pharmaceuticals and Medical Devices Agency. When an application is submitted for a pharmaceutical whose active ingredients, quantities, administration and dosage, method of use, indications and effects are distinctly different from those of pharmaceuticals which have already been approved, the MHLW must seek the opinion of the Pharmaceutical Affairs and Food Sanitation Council.

The Pharmaceutical Affairs Law provides that when (a) the pharmaceutical that is the subject of an application is shown not to result in the indicated effects or performance indicated in the application, (b) the pharmaceutical is found to have no value as a pharmaceutical because it has harmful effects outweighing its indicated effects or performance, or (c) in addition to (a) and (b) above, when the pharmaceutical falls within the category designated by the relevant Ministerial Ordinance as not being appropriate as a pharmaceutical, Marketing Approval shall not be granted.

The MHLW must cancel a Marketing Approval, after hearing the opinion of the Pharmaceutical Affairs and Food Sanitation Council, when the MHLW finds that the relevant pharmaceutical falls under any of (a) through (c) above. In addition, the MHLW can order the amendment of a Marketing Approval when it is necessary to do so from the viewpoint of public health and hygiene. Moreover, the MHLW can order the cancellation or amendment of a Marketing Approval when (1) the necessary materials for re-examination or re-evaluation, which the MHLW has ordered considering the character of pharmaceuticals, have not been submitted, false materials have been submitted or the materials submitted do not comply with the criteria specified by the MHLW, (2) the relevant company's Marketing License has expired or has been canceled (a Marketing License needs to be renewed every five years), (3) the regulations regarding investigations of facilities in relation to manufacturing management standards or quality control have been violated, (4) the conditions set in relation to the Marketing Approval have been violated, or (5) the relevant pharmaceutical has not been marketed for three consecutive years without a due reason.

Doctors and pharmacists providing medical services pursuant to national health insurance are prohibited from using pharmaceuticals other than those specified by the MHLW. The MHLW also specifies the standards of pharmaceutical prices, which we refer to herein as Drug Price Standards. The Drug Price Standards are used as the basis of the calculation of the price paid by medical insurance for pharmaceuticals. The governmental policy relating to medical services and the health insurance system, as well as the Drug Price Standards, is revised every two years.

*Brazil*

In Brazil, pharmaceutical manufacturers and products are regulated by the National Agency of Sanitary Surveillance ("ANVISA"). ANVISA is a governmental body directly linked to the Ministry of Health, responsible for promoting the protection of the health of the population through the sanitary control of production, storage, distribution, importation and marketing of products and services subject to sanitary surveillance. ANVISA is responsible for registering drugs and supervising quality control, as well as issuing licenses to companies for the manufacturing, handling, packaging, distribution, advertising, importation and exportation of pharmaceutical products.

*API*

The primary regulatory oversight of API manufacturers is through inspection of the manufacturing facility in which APIs are produced, as well as the manufacturing processes and standards employed in the facility. The regulatory process by which API manufacturers generally register their products for commercial sale in the U.S. and other similarly regulated countries is via the filing of a DMF. DMFs are confidential documents containing information on the manufacturing facility and processes used in the manufacture, characterization, quality control, packaging and storage of an API. The DMF is reviewed for completeness by the FDA, or other similar regulatory agencies in other countries, in conjunction with applications filed by FDF manufacturers, requesting approval to use the given API in the production of their drug products.

16

Table of Contents

*Specialty Segment*

The process required by the FDA before a pharmaceutical product with active ingredients that have not been previously approved may be marketed in the U.S. generally involves the following:

- laboratory and preclinical tests;

- submission of an Investigational New Drug ("IND") application, which must become effective before clinical studies may begin;

- adequate and well-controlled human clinical studies to establish the safety and efficacy of the proposed product for its intended use;

- submission of an NDA containing the results of the preclinical tests and clinical studies establishing the safety and efficacy of the proposed product for its intended use, as well as extensive data addressing matters such as manufacturing and quality assurance;

- scale-up to commercial manufacturing; and

- FDA approval of an NDA.

Preclinical tests include laboratory evaluation of the product and its chemistry, formulation and stability, as well as toxicology and pharmacology studies to help define the pharmacological profile of the drug and assess the potential safety and efficacy of the product. The results of these studies are submitted to the FDA as part of the IND. They must demonstrate that the product delivers sufficient quantities of the drug to the bloodstream or intended site of action to produce the desired therapeutic results, before human clinical trials may begin. These studies must also provide the appropriate supportive safety information necessary for the FDA to determine whether the clinical studies proposed to be conducted under the IND can safely proceed. The IND automatically becomes effective 30 days after receipt by the FDA unless the FDA, during that 30-day period, raises concerns or questions about the conduct of the proposed trials, as outlined in the IND. In such cases, the IND sponsor and the FDA must resolve any outstanding concerns before clinical trials may begin. In addition, an independent institutional review board must review and approve any clinical study prior to initiation.

Human clinical studies are typically conducted in three sequential phases, which may overlap:

- *Phase I* – The drug is initially introduced into a relatively small number of healthy human subjects or patients and is tested for safety, dosage tolerance, mechanism of action, absorption, metabolism, distribution and excretion.

- *Phase II* – Studies are performed with a limited patient population to identify possible adverse effects and safety risks, to assess the efficacy of the product for specific targeted diseases or conditions, and to determine dosage tolerance and optimal dosage.

- *Phase III* – When Phase II evaluations demonstrate that a dosage range of the product is effective and has an acceptable safety profile, Phase III trials are undertaken to evaluate further dosage and clinical efficacy and to test further for safety in an expanded patient population at geographically dispersed clinical study sites.

The results of the product development, preclinical studies and clinical studies are then submitted to the FDA as part of the NDA. The NDA drug development and approval process could take from three to more than ten years.

**Research and Development**

R&D efforts are conducted on a global basis, primarily to enable us to develop, manufacture and market approved pharmaceutical products in accordance with applicable government regulations. We have significantly bolstered our global R&D capabilities over the past several years, in particular in the injectables area, through the 2013 acquisition of Agila and the 2010 acquisition of Bioniche Pharma. With the recent acquisition of Agila , Mylan has the capability to develop and commercialize a broad range of injectable compounds and injectable dosage form types. Through our 2011 acquisition of the respiratory delivery platform, we have the capability to develop and commercialize respiratory therapies. In the U.S., our largest market, the FDA is the principal regulatory body with respect to pharmaceutical products. Each of our other markets has separate pharmaceutical regulatory bodies, including, but not limited to, the Agence Nationale de Securite du Medicament et de Sante in France, Health Canada, the Medicines and Healthcare products Regulatory Agency in the U.K., the EMA (a decentralized body of the EU), the Bundesinstitut für Arzneimittel und Medizinprodukte in Germany, the Irish Medicines Board in Ireland, the Agenzia Italiana del Farmaco in Italy, the Agencia Española de Medicamentos y Productos Sanitarios in Spain,

17

the TGA in Australia, the MHLW in Japan, Drug Controller General of India, ANVISA in Brazil and the World Health Organization ("WHO"), the regulatory body of the United Nations.

Our global R&D strategy emphasizes the following areas:

- development of both branded and generic finished dose products for the global marketplace, including ARV programs;

- development of pharmaceutical products that are technically difficult to formulate or manufacture because of either unusual factors that affect their stability or bioequivalence or unusually stringent regulatory requirements;

- development of novel controlled-release technologies and the application of these technologies to reference products;

- development of drugs that target smaller, specialized or underserved markets;

- development of generic drugs that represent first-to-file opportunities in the U.S. market;

- expansion of the existing oral solid dosage product portfolio, including with respect to additional dosage strengths;

- development of injectable products;

- development of unit dose oral inhalation products for nebulization;

- development of APIs;

- development of compounds using a dry powder inhaler and/or metered-dose inhaler for the treatment of asthma and COPD and other respiratory therapies;

- development of monoclonal anti-bodies ("biologics");

- completion of additional preclinical and clinical studies for approved NDA products required by the FDA, known as post-approval (Phase IV) commitments; and

- conducting life-cycle management studies intended to further define the profile of products subject to pending or approved NDAs.

The success of generic biologics in the marketplace and our ability to be successful in this emerging market will depend on the implementation of balanced scientific standards for approval, while not imposing excessive clinical testing demands or other hurdles for well-established products. Furthermore, an efficient patent resolution mechanism and a well-defined mechanism to grant interchangeability after the establishment of biosimilarity with the reference biological product will be key elements determining our future success in this area.

We have a robust generic pipeline. As of December 31, 2013 , we had approximately 1,500 country level product approvals pending. During 2013 , we completed 568 global country level product submissions, which included 69 in North America, 280 in EMEA and 219 in the Rest of World. These submissions included those for existing products in new markets as well as products new to the Mylan portfolio.

During the year ended December 31, 2013 , we received 516 product approvals globally, including individual country level approvals. Of that total, there were 62 approvals in North America, including 32 in the U.S., 308 approvals in EMEA and 146 approvals in the Rest of World of which 98 approvals were for ARV products. The 32 approvals in the U.S. consisted of 22 final ANDA approvals and ten tentative ANDA approvals. The 98 country level ARV approvals received consisted of 25 products in 19 different countries, with no ARV approvals in the U.S. based upon the U.S. President's Emergency Plan for AIDS Relief.

As of December 31, 2013 , we had 324 ANDAs pending FDA approval, representing approximately $94.0 billion in annual sales for the brand name equivalents of these products for the year ended December 31, 2013 . Of those pending product applications, 41 were first-to-file Paragraph IV ANDA patent challenges, representing approximately $24.1 billion in annual brand sales for the year ended December 31, 2013 . The historic branded drug sales are not indicative of future generic sales, but are included to illustrate the size of the branded product market. Our R&D spending was $508 million , $401 million and $295 million in 2013 , 2012 and 2011 , respectively.

18

## Patents, Trademarks and Licenses

We own or license a number of patents in the U.S. and other countries covering certain products and have also developed brand names and trademarks for other products. Generally, the brand pharmaceutical business relies upon patent protection to ensure market exclusivity for the life of the patent. We consider the overall protection of our patents, trademarks and license rights to be of significant value and act to protect these rights from infringement. However, our business is not dependent upon any single patent, trademark or license.

In the branded pharmaceutical industry, the majority of an innovative product's commercial value is usually realized during the period in which the product has market exclusivity. In the U.S. and some other countries, when market exclusivity expires and generic versions of a product are approved and marketed, there can often be very substantial and rapid declines in the branded product's sales. The rate of this decline varies by country and by therapeutic category; however, following patent expiration, branded products often continue to have market viability based upon the goodwill of the product name, which typically benefits from trademark protection.

An innovator product's market exclusivity is generally determined by two forms of intellectual property: patent rights held by the innovator company and any regulatory forms of exclusivity to which the innovator is entitled.

Patents are a key determinant of market exclusivity for most branded pharmaceuticals. Patents provide the innovator with the right to lawfully exclude others from practicing an invention related to the medicine. Patents may cover, among other things, the active ingredient(s), various uses of a drug product, pharmaceutical formulations, drug delivery mechanisms and processes for (or intermediates useful in) the manufacture of products. Protection for individual products extends for varying periods in accordance with the expiration dates of patents in the various countries. The protection afforded, which may also vary from country to country, depends upon the type of patent, its scope of coverage and the availability of meaningful legal remedies in the country.

Market exclusivity is also sometimes influenced by regulatory intellectual property rights. Many developed countries provide certain non-patent incentives for the development of medicines. For example, the U.S., the EU and Japan each provide for a minimum period of time after the approval of a new drug during which the regulatory agency may not rely upon the innovator's data to approve a competitor's generic copy. Regulatory intellectual property rights are also available in certain markets as incentives for research on new indications, on orphan drugs and on medicines useful in treating pediatric patients. Regulatory intellectual property rights are independent of any patent rights and can be particularly important when a drug lacks broad patent protection. However, most regulatory forms of exclusivity do not prevent a competitor from gaining regulatory approval prior to the expiration of regulatory data exclusivity on the basis of the competitor's own safety and efficacy data on its drug, even when that drug is identical to that marketed by the innovator.

We estimate the likely market exclusivity period for each of our branded products on a case-by-case basis. It is not possible to predict the length of market exclusivity for any of our branded products with certainty because of the complex interaction between patent and regulatory forms of exclusivity and inherent uncertainties concerning patent litigation. There can be no assurance that a particular product will enjoy market exclusivity for the full period of time that we currently estimate or that the exclusivity will be limited to the estimate.

In addition to patents and regulatory forms of exclusivity, we also market products with trademarks. Trademarks have no effect on market exclusivity for a product, but are considered to have marketing value. Trademark protection continues in some countries as long as used; in other countries, as long as registered. Registration is for fixed terms and may be renewed indefinitely.

## Customers and Marketing

*Generics Segment*

In North America, we market products directly to wholesalers, distributors, retail pharmacy chains, long-term care facilities, mail order pharmacies and GPOs. We also market our generic products indirectly to independent pharmacies, managed care organizations, hospitals, nursing homes, pharmacy benefit management companies and government entities. These customers, called "indirect customers," purchase our products primarily through our wholesale customers. In North America, wholesalers and retail drug chains have undergone, and are continuing to undergo, significant consolidation, which may result in these groups gaining additional purchasing leverage.

19

Table of Contents

In EMEA and the Rest of World, generic pharmaceuticals are sold to wholesalers, independent pharmacies and, in certain countries, directly to hospitals. Through a broad network of sales representatives, we adapt our marketing strategy to the different markets as dictated by their respective regulatory and competitive landscapes. Our API are sold primarily to generic FDF manufacturers throughout the world, as well as to other Mylan subsidiaries.

*Specialty Segment*

Mylan Specialty markets its products to a number of different customer audiences in the U.S., including health care practitioners, wholesalers, pharmacists and pharmacy chains, hospitals, payers, pharmacy benefit manager, health maintenance organizations ("HMOs"), home health care, long-term care and patients. We reach these customers through our field-based sales force and National Accounts team of approximately 370  employees, to increase our customers' understanding of the unique clinical characteristics and benefits of our branded products. Additionally, Mylan Specialty supports educational programs to consumers and patients.

*Major Customers*

During 2013 , 2012 and 2011 , sales to Cardinal Health, Inc. represented approximately 15% , 14% and 13% of consolidated net revenues, respectively.

During 2013 , 2012 and 2011 , sales to McKesson Corporation represented approximately 14% , 13% and 11% of consolidated net revenues, respectively.

Consistent with industry practice, we have a return policy that allows our customers to return product within a specified period prior to and subsequent to the expiration date. See the Application of Critical Accounting Policies section of our "Management's Discussion and Analysis of Results of Operations and Financial Condition" for a discussion of our more significant revenue recognition provisions.

## Competition

Our primary competitors include other generic companies (both major multinational generic drug companies and various local generic drug companies) and branded drug companies that continue to sell or license branded pharmaceutical products after patent expirations and other statutory expirations. In the branded space, key competitors are generally other branded drug companies that compete based on their clinical characteristics and benefits.

Competitive factors in the major markets in which we participate can be summarized as follows:

*United States.*  The U.S. pharmaceutical industry is very competitive. Our competitors vary depending upon therapeutic areas and product categories. Primary competitors include the major manufacturers of brand name and generic pharmaceuticals.

The primary means of competition are innovation and development, timely FDA approval, manufacturing capabilities, product quality, marketing, portfolio offering size, customer service, reputation and price. The environment of the U.S. pharmaceutical marketplace is highly sensitive to price. To compete effectively, we rely on cost-effective manufacturing processes to meet the rapidly changing needs of our customers around a reliable, high quality supply of generic pharmaceutical products. With regard to our Specialty segment business, significant sales and marketing effort is required to be directed to each targeted customer segment in order to compete effectively.

Our competitors include other generic manufacturers, as well as brand companies that license their products to generic manufacturers prior to patent expiration or as relevant patents expire. Further regulatory approval is not required for a brand manufacturer to sell its pharmaceutical products directly or through a third-party to the generic market, nor do such manufacturers face any other significant barriers to entry into such market. Related to our Specialty segment business, our competitors include branded manufacturers who offer products for the treatment of COPD and severe allergies, as well as brand companies that license their products to generic manufacturers prior to patent expiration.

The U.S. pharmaceutical market is undergoing, and is expected to continue to undergo, rapid and significant technological changes, and we expect competition to intensify as technological advances are made. We intend to compete in this marketplace by (1) developing therapeutic equivalents to branded products that offer unique marketing opportunities, are difficult to formulate and/or have significant market size, (2) developing or licensing brand pharmaceutical products that are

20

Table of Contents

either patented or proprietary and (3) developing or licensing pharmaceutical products that are primarily for indications having relatively large patient populations or that have limited or inadequate treatments available, among other strategies.

Our sales can be impacted by new studies that indicate that a competitor's product has greater efficacy for treating a disease or particular form of a disease than one of our products. Our sales also can be impacted by additional labeling requirements relating to safety or convenience that may be imposed on our products by the FDA or by similar regulatory agencies. If competitors introduce new products and processes with therapeutic or cost advantages, our products can be subject to progressive price reductions and/or decreased volume of sales.

Medicaid, a U.S. federal health care program, requires all pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. The Patient Protection and Affordable Care Act (the "PPACA") and the Health Care and Education and Reconciliation Act of 2010, which amends the PPACA, raised the rebate percentages for both generic and brand pharmaceuticals effective January 1, 2010. The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed products marketed under ANDAs, up from 11% for periods prior to 2010. Sales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate the greater of approximately 23% (up from 15% ) of the average manufacturer's price or the difference between the average manufacturer's price and the best price during a specific period. We believe that federal or state governments may continue to enact measures aimed at reducing the cost of drugs to the public.

Under Part D of the Medicare Modernization Act, Medicare beneficiaries are eligible to obtain discounted prescription drug coverage from private sector providers. As a result, usage of pharmaceuticals has increased, which is a trend that we believe will continue to benefit the generic pharmaceutical industry. However, such potential sales increases may be offset by increased pricing pressures, due to the enhanced purchasing power of the private sector providers that are negotiating on behalf of Medicare beneficiaries.

*Canada.* Canada is a well-established generics market characterized by a number of local and multi-national competitors. The individual Canadian provinces control pharmaceutical pricing and reimbursement. A number of Canada's provinces are moving towards a tender system, which has and may continue to negatively affect the pricing of pharmaceutical products.

*France.* Generic penetration in France is relatively low compared to other large pharmaceutical markets, with low prices resulting from government initiatives. As pharmacists are the primary customers in this market, established relationships, driven by breadth of portfolio and effective supply chain management, are key competitive advantages.

*Italy.* The Italian generic market is relatively small due to few incentives for market stakeholders and in part to low prices on available brand name drugs. Also to be considered is the fact that the generic market in Italy suffered a certain delay compared to other European countries due to extended patent protection. The Italian government has put forth only limited measures aimed at increasing generic usage, and as such generic substitution is still in its early stages. Pharmacists will play a key role in future market expansion, due to higher margins provided by generic versus branded products.

*United Kingdom.* The U.K. is one of the most competitive markets, with low barriers to entry and a high degree of fragmentation. Competition among manufacturers, along with indirect control of pricing by the government, has led to strong downward pricing pressure. Companies in the U.K. will continue to compete on price, with consistent supply chain and breadth of product portfolio also coming into play.

*Spain.* Spain is a rapidly growing, highly fragmented generic market with many participants. As a result of recent legislative changes, all regions within Spain will move to INN prescribing and substitution, thus making the pharmacists the key driver of generic usage. Within the last two years, the Andalusia region, representing 20% of the total market, has evolved into a tendering commercial model. However, it is currently anticipated that this move will be gradually reversed during the 2014 - 2016 period due to Central Government opposition. Companies compete in Spain based on being first to market, offering a wide portfolio, building strong relationships with customers and providing a consistent supply of quality products.

*The Netherlands.* The Netherlands market has become highly competitive as a result of a large number of generic players, one of the highest generic penetration rates in Europe and the continued use of a tender system. Under a tender system, health insurers are entitled to issue invitations to tender products. Pricing pressures resulting from an effort to win the tender should drive near-term competition. Mylan is able to play a significant role in tenders but also has strong non-tendered sales which provides further opportunities for growth.

*Germany.* The German market has become highly competitive as a result of a large number of generic players, one of the highest generic penetration rates in Europe, and the continued use of a tender system. Pricing pressures resulting from an effort to win the tender should drive near-term competition.

*Poland.* Poland is a mature and well-established generics market characterized by a high level of generic penetration in comparison to other large European pharmaceutical markets. Generic substitution is permitted, but not obligatory and pricing is indirectly controlled by the government. There are a large number of local and multi-national competitors within the market.

*India.* Intense competition by other API suppliers in the Indian pharmaceuticals market has, in recent years, led to increased pressure on prices. We expect that the exports of API and generic FDF products from India to developed markets will continue to increase. The success of Indian pharmaceutical companies is attributable to established development expertise in chemical synthesis and process engineering, development of FDF, availability of highly skilled labor and the low cost manufacturing base.

The Indian commercial market is a rapidly growing, highly fragmented generic market with a significant number of participants. Companies compete in India based on price, product portfolio and the ability to provide a consistent supply of quality products.

*Australia.* The Australian generic market is small by international standards, in terms of prescriptions, value and the number of active participants. Patent extensions that delayed patent expiration are somewhat responsible for under-penetration of generic products.

*Japan.* Historically, government initiatives have kept all drug prices low, resulting in little incentive for generic usage. More recent pro-generic actions by the government should lead to growth in the generics market, in which doctors, pharmacists and hospital purchasers will all play a key role.

*Brazil.* The Brazilian pharmaceutical market is the largest in South America. Since the entry in force of generic drug laws in Brazil, the generic segment of the pharmaceutical market has grown rapidly. The industry is highly competitive with a broad presence of multinational and national competitors.

## Product Liability

Global product liability litigation represents an inherent risk to firms in the pharmaceutical industry. We utilize a combination of self-insurance (including through our wholly owned captive insurance subsidiary) and traditional third-party insurance policies with regard to our product liability claims. Such insurance coverage at any given time reflects market conditions, including cost and availability, existing at the time the policy is written and the decision to obtain commercial insurance coverage or to self-insure varies accordingly.

## Raw Materials

Mylan utilizes a global approach to managing relationships with its suppliers. The APIs and other materials and supplies used in our pharmaceutical manufacturing operations are generally available and purchased from many different U.S. and non-U.S. suppliers, including Mylan India. However, in some cases, the raw materials used to manufacture pharmaceutical products are available only from a single supplier. Even when more than one supplier exists, we may choose, and in some cases have chosen, only to list one supplier in our applications submitted to the FDA. Any change in a supplier not previously approved must then be submitted through a formal approval process with the FDA.

## Seasonality

Certain parts of our business are affected by seasonality, primarily the Specialty segment and the Rest of World within our Generics segment. The seasonal impact of these particular businesses may affect a quarterly comparison within any fiscal year; however, this impact is generally not material to our annual consolidated results.

## Environment

We strive to comply in all material respects with applicable laws and regulations concerning the environment. While it is impossible to predict accurately the future costs associated with environmental compliance and potential remediation activities, compliance with environmental laws is not expected to require significant capital expenditures and has not had, and is not expected to have, a material adverse effect on our operations or competitive position.

**Employees**

Mylan's global workforce includes more than 20,000 employees and external contractors. Certain production and maintenance employees at our manufacturing facility in Morgantown, West Virginia, are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 8-957 AFL-CIO under a contract that expires on April 21, 2017. In addition, there are non-U.S. Mylan locations that have employees who are unionized or part of works councils or trade unions.

**Securities Exchange Act Reports**

Mylan maintains an Internet website at the following address: mylan.com . We make available on or through our Internet website certain reports and amendments to those reports that we file with the Securities and Exchange Commission (the "SEC") in accordance with the Securities Exchange Act of 1934. These include our annual reports on Form 10-K, our quarterly reports on Form 10-Q and our current reports on Form 8-K. We make this information available on our website free of charge, as soon as reasonably practicable after we electronically file the information with, or furnish it to, the SEC. The contents of our website are not incorporated by reference in this Report on Form 10-K and shall not be deemed "filed" under the Securities Exchange Act of 1934.

The public may also read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street NE, Washington, D.C. 20549. You may obtain information about the Public Reference Room by contacting the SEC at 1-800-SEC-0330. Reports filed with the SEC are also made available on the SEC website (www.sec.gov).

**ITEM 1A.    Risk Factors**

We operate in a complex and rapidly changing environment that involves risks, many of which are beyond our control. Any of the following risks, if they occur, could have a material adverse effect on our business, financial position, results of operations, or cash flows and could cause the market value of our common stock to decline. These risks should be read in conjunction with the other information in this Annual Report on Form 10-K.

***CURRENT AND CHANGING ECONOMIC CONDITIONS MAY ADVERSELY AFFECT OUR INDUSTRY, BUSINESS, PARTNERS AND SUPPLIERS, FINANCIAL POSITION, RESULTS OF OPERATIONS AND/OR CASH FLOW, AND COULD CAUSE THE MARKET VALUE OF OUR COMMON STOCK TO DECLINE.***

The global economy continues to experience significant volatility, and the economic environment may continue to be, or become, less favorable than that of past years. Among other matters, the continued risk of a debt default by one or more European countries, related financial restructuring efforts in Europe, and/or evolving deficit and spending reduction programs instituted by the U.S. and other governments could negatively impact the global economy and/or the pharmaceutical industry. This has led, and/or could lead, to reduced consumer and customer spending and/or reduced or eliminated governmental or third party payor coverage or reimbursement in the foreseeable future, and this may include spending on health care, including but not limited to pharmaceutical products. While generic drugs present an alternative to higher-priced branded products, our sales could be negatively impacted if patients forego obtaining health care, patients and customers reduce spending or purchases, and/or if governments and/or third-party payors reduce or eliminate coverage or reimbursement amounts for pharmaceuticals and/or impose price or other controls adversely impacting the price or availability of pharmaceuticals. In addition, reduced consumer and customer spending, and/or reduced government and/or third party payor coverage or reimbursement, and/or new government controls, may drive us and our competitors to decrease prices and/or may reduce the ability of customers to pay and/or may result in reduced demand for our products. The occurrence of any of these risks could have a material adverse effect on our industry, business, financial position, results of operations and/or cash flow, and could cause the market value of our common stock to decline.

***OUR BUSINESS, FINANCIAL POSITION, AND RESULTS OF OPERATIONS ARE SUBJECT TO RISKS ARISING FROM THE INTERNATIONAL SCOPE OF OUR OPERATIONS.***

Our operations extend to numerous countries outside the U.S., and are subject to the risks inherent in conducting business globally and under the laws, regulations, and customs of various jurisdictions. These risks include, but are not limited to:

- compliance with a variety of national and local laws of countries in which we do business, including but not limited to restrictions on the import and export of certain intermediates, drugs, and technologies;

**EXHIBIT INDEX**

| | |
|---|---|
| 10.4(d) | Form of Restricted Stock Unit Award Agreement under the 2003 Long-Term Incentive Plan for awards granted prior to fiscal year 2013.* |
| 10.4(e) | Form of Performance-Based Restricted Stock Unit Award Agreement under the 2003 Long-Term Incentive Plan for awards granted prior to fiscal year 2013.* |
| 10.4(i) | Amended and Restated Form of Stock Option Agreement under the 2003 Long-Term Incentive Plan for awards granted following fiscal year 2012.* |
| 10.4(j) | Amended and Restated Form of Restricted Stock Unit Award Agreement under the 2003 Long-Term Incentive Plan for awards granted following fiscal year 2012.* |
| 10.4(k) | Amended and Restated Form of Performance-Based Restricted Stock Unit Award Agreement under the 2003 Long-Term Incentive Plan for awards granted following fiscal year 2012.* |
| 10.27(b) | The Executive Nonqualified Excess Plan Adoption Agreement, effective as of December 28, 2007, between Mylan International Holdings, Inc. and Rajiv Malik.* |
| 10.29(b) | Description of Amendments to the Retirement Benefit Agreement, dated January 27, 1995, between the registrant and Clarence B. Todd.* |
| 10.38 | Amended and Restated Form of Indemnification Agreement between the registrant and each Director.* |
| 10.50 | Amended and Restated Sale and Purchase Agreement, dated December 4, 2013, by and among the registrant, Mylan Institutional Inc., Strides Pharma Asia Pte Ltd (Agila Specialties Asia Pte Ltd), and the promoters named therein.** |
| 10.51 | Amended and Restated Sale and Purchase Agreement, dated December 4, 2013, by and among the registrant, Mylan Laboratories Limited, Strides Arcolab Limited, and the promoters named therein.** |
| 10.53(b) | Amendment to Completion Deed, effective December 4, 2013, by and among Mylan Institutional Inc., Mylan Laboratories Limited, Strides Arcolab Limited, Strides Pharma Asia Pte Ltd (f/k/a Agila Specialties Asia Pte Ltd), and the promoters named therein.** |
| 10.57 | The Executive Nonqualified Excess Plan, effective as of December 28, 2007, between Mylan International Holdings, Inc. and Rajiv Malik.* |
| 12.1 | Statement of Computation of Ratios of Earnings to Fixed Charges and Preferred Stock Dividends. |
| 21 | Subsidiaries of the registrant. |
| 23 | Consent of Independent Registered Public Accounting Firm. |
| 31.1 | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32 | Certification of Principal Executive Officer and Principal Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema |

101.CAL          XBRL Taxonomy Extension Calculation Linkbase

101.LAB          XBRL Taxonomy Extension Label Linkbase

101.PRE          XBRL Taxonomy Extension Presentation Linkbase

101.DEF          XBRL Taxonomy Extension Definition Linkbase


\*          Denotes management contract or compensatory plan or arrangement.

\*\*          The Company has requested confidential treatment with respect to certain portions of this exhibit.

132

EXHIBIT 21

**Subsidiaries**

| Name | State or Country of Organization |
|------|----------------------------------|
| Mylan Pharmaceuticals Inc. | West Virginia |
| Mylan Technologies, Inc. | West Virginia |
| Mylan Institutional Inc. | Illinois |
| Mylan LLC | Delaware |
| Mylan Caribe, Inc. | Vermont |
| Mylan International Holdings, Inc. | Vermont |
| MLRE LLC | Pennsylvania |
| Synerx Pharma, LLC | Pennsylvania |
| MP Air, Inc. | West Virginia |
| American Triumvirate Insurance Company | Vermont |
| Somerset Pharmaceuticals, Inc. | Delaware |
| Mylan Bertek Pharmaceuticals Inc. | Texas |
| Agila Especialidades Farmaceutica Ltda | Brazil |
| Agila Farmaceutica Participacoes Ltda | Brazil |
| Agila Marketing e Distribuicao de Produtos Hospitalares Ltda | Brazil |
| MP Laboratories (Mauritius) Ltd. | Mauritius |
| Mylan Singapore Pte. Ltd. | Singapore |
| Mylan Pharmaceuticals ULC | Canada |
| QD Pharmaceuticals ULC | Canada |
| Agila Jamp Canada Inc. | Canada |
| Agila Specialties Pharma Corporation | Canada |
| Agila Specialties Americas Ltd. | Cyprus |
| Agila Specialties (Holdings) Cyprus Ltd. | Cyprus |
| Onco Laboratories Ltd. | Cyprus |
| Mylan Australia Pty Ltd. | Australia |
| Mylan Australia Holding Pty Ltd. | Australia |
| Agila Australasia Pty Ltd. | Australia |
| Catalist Pty Ltd. | Australia |
| Mylan Delaware Inc. | Delaware |
| Mylan LHC Inc. | Delaware |
| Mylan Bermuda Ltd. | Bermuda |
| Mylan Luxembourg L3 S.C.S. | Luxembourg |
| Mylan Luxembourg L4 S.C.S. | Luxembourg |
| Mylan Luxembourg 1 S.a r.l. | Luxembourg |
| Mylan Luxembourg 2 S.a r.l. | Luxembourg |
| Mylan Luxembourg 3 S.a r.l. | Luxembourg |
| Mylan Luxembourg 6 S.a r.l. | Luxembourg |
| Mylan Luxembourg 7 S.a r.l. | Luxembourg |
| Mylan Luxembourg 8 S.a r.l. | Luxembourg |
| Mylan Luxembourg 9 S.a r.l. | Luxembourg |
| Mylan (Gibraltar) 1 Ltd. | Gibraltar |
| Mylan (Gibraltar) 2 Ltd. | Gibraltar |

| Name | State or Country of Organization |
| --- | --- |
| Mylan (Gibraltar) 3 Ltd. | Gibraltar |
| Mylan (Gibraltar) 4 Ltd. | Gibraltar |
| Mylan (Gibraltar) 5 Ltd. | Gibraltar |
| Mylan (Gibraltar) 6 Ltd. | Gibraltar |
| Mylan (Gibraltar) 7 Ltd. | Gibraltar |
| Mylan (Gibraltar) 8 Ltd. | Gibraltar |
| Mylan (Gibraltar) 9 Ltd. | Gibraltar |
| Mylan dura GmbH | Germany |
| Mylan S.A.S. | France |
| Mylan Generics France Holding S.A.S. | France |
| Mylan EMEA S.A.S. | France |
| Mylan FCT | France |
| Mylan, Lda | Portugal |
| Laboratorios Anova - Produtos Famaceuticos, LDA | Portugal |
| Societe de Participation Pharmaceutique S.A.S. | France |
| Generics [U.K.] Ltd. | United Kingdom |
| Mylan Pharma UK Ltd. | United Kingdom |
| Agila Specialties Investment Ltd. | United Kingdom |
| Agila Specialties UK Ltd. | United Kingdom |
| McDermott Laboratories Ltd. | Ireland |
| Mylan Investments Ltd. | Ireland |
| Mylan Pharma Holdings Ltd. | Ireland |
| Mylan Pharma Group Ltd. | Ireland |
| Mylan Pharma (Canada) Ltd. | Canada |
| Mylan Institutional LLC | Delaware |
| Mylan Pharma Acquisition Ltd. | Ireland |
| Mylan Teoranta | Ireland |
| Mylan Ireland Ltd. | Ireland |
| Mylan Ireland Holdings Ltd. | Ireland |
| Mylan B.V. | Netherlands |
| Arcana Arzneimittel GmbH | Austria |
| Mylan S.p.A. | Italy |
| Qualimed S.A.S. | France |
| Mylan Pharmaceuticals S.A. | Morocco |
| Generics Pharma Hellas E.P.E. | Greece |
| Mylan GmbH | Switzerland |
| Mylan Holdings GmbH | Switzerland |
| Mylan BVBA | Belgium |
| Mylan Group B.V. | Netherlands |
| Xixia Pharmaceuticals (Pty) Ltd. | South Africa |
| SCP Pharmaceuticals (Pty) Ltd. | South Africa |
| Mylan (Proprietary) Ltd. | South Africa |
| Mylan Pharmaceuticals S.L. | Spain |
| Prasfarma Oncologicos S.L. | Spain |
| Scandinavian Pharmaceuticals-Generics AB | Sweden |

| Name | State or Country of Organization |
|---|---|
| Scandpharm Marketing AB | Sweden |
| Mylan OY | Finland |
| Mylan AB | Sweden |
| Mylan ApS | Denmark |
| Mylan AS | Norway |
| Farma Plus AS | Norway |
| Genpharm General Partner, Inc. | New York |
| Genpharm Limited Partner, Inc. | New York |
| Mylan Pharmaceuticals Private Ltd. | India |
| Mylan Laboratories India Private Ltd. | India |
| Agila Specialties Private Ltd. | India |
| Onco Therapies Ltd. | India |
| Mylan Seiyaku Ltd. | Japan |
| Alphapharm Pty Ltd. | Australia |
| Mylan New Zealand Ltd. | New Zealand |
| Pacific Pharmaceuticals Ltd. | New Zealand |
| Agila (NZ) Pty Ltd. | New Zealand |
| EMD, Inc. | Delaware |
| Dey, Inc. | Delaware |
| Dey Limited Partner LLC | Delaware |
| Mylan Specialty L.P. | Delaware |
| Mylan Special Investments LLC | Delaware |
| Mylan Special Investments II, LLC | Delaware |
| Mylan Special Investments III, LLC | Delaware |
| Mylan Special Investments IV, LLC | Delaware |
| Mylan Special Investments V, LLC | Delaware |
| RCF 4, LLC | Delaware |
| Mylan Securitization LLC | Delaware |
| Mylan Investment Holdings 4 LLC | Delaware |
| Mylan Investment Holdings 5 LLC | Delaware |
| Mylan Investment Holdings 6 LLC | Delaware |
| Mylan Sp. Z.o.o. | Poland |
| Agila Specialties Polska sp. Zo.o | Poland |
| Mylan s.r.o. | Slovakia |
| Mylan d.o.o. | Slovenia |
| Mylan Pharmaceuticals s.r.o. | Czech Republic |
| Mylan Kft. | Hungary |
| Mylan Hungary Kft. | Hungary |
| Mylan Pharmaceuticals LLC | Ukraine |
| Mylan Laboratories Ltd. | India |
| Matrix Laboratories BVBA | Belgium |
| Matrix Laboratories Singapore (Pte.) Ltd. | Singapore |
| Agila Specialties Global Pte. Ltd. | Singapore |
| Mylan Laboratories, Inc. | Delaware |
| Matrix Pharma Group (Xiamen) Ltd. | People's Republic of China |

| Name | State or Country of Organization |
| --- | --- |
| Jiangsu Matrix Pharmaceutical Chemical Ltd. | People's Republic of China |
| Matrix Laboratories (Xiamen) Ltd. | People's Republic of China |
| Mylan (Taiwan) Ltd. | Taiwan Province of China |
| Astrix Laboratories Ltd. | India |
| Docpharma BVBA | Belgium |
| Aktuapharma NV | Belgium |
| Apothecon B.V. | Netherlands |
| DAA Pharma S.A. | Switzerland |
| Hospithera NV | Belgium |
| Agila Specialties Inc. | New Jersey |
| Sagent Agila LLC | Wyoming |